[Civ. No. 50456. First Dist., Div. One. July 29, 1981.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
BEVERLY E. McBRIDE et al., Real Parties in Interest.

158

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson and Ann K. Jensen, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Paul Ligda, Public Defender, Brad Nelson, Deputy Public Defender, Martin D. Lurie, Lurie & Satz and Anthony Finkas for Real Parties in Interest.

OPINION

GRODIN, J.—In a proceeding under Penal Code section 1538.5, respondent court granted a motion by real parties in interest to suppress evidence obtained in an automobile search, on the ground that the search was the product of an illegal detention.[1] The People sought review of that order through petition for writ of mandamus, and upon direction by the Supreme Court we issued an alternative writ. The principal issue presented involves standards for determining the validity of a detention based, in part, upon information which police received from an informer. We shall conclude that the trial court misapplied applicable standards and that its order must, accordingly, be vacated.

*Factual Background.*

On December 12, 1979, a warrant issued for the arrest of Oscar Gates on various charges, including the murder of Lonnie Stevenson in Oakland earlier that month. On December 29, 1979, Oakland Police Officer Michael Sitterud, who was investigating that murder, called Detective Crapo of the Vallejo Police Department and told him he thought Oscar Gates could be found at a certain location in Vallejo, that he would be there only for a short time, and that he was dangerous. Detective Crapo, who had already received considerable background information relating to Oscar Gates, proceeded to the address indicated, which was that of a residence, and upon arrival observed three men exit a green and white Cadillac and enter the house. Later, two men left the house and reentered the car; the driver made a U-turn, and started to drive off in a southerly direction. There were now four men in the car, but Crapo could not tell if they were the same men who had gone into the house. Believing that Gates might be one of them,[2] he radioed for one of the backup patrol units to stop the car, and they did. One of the passengers said his name was "Dale Gates," but he offered no identification and the police, believing that he matched a composite

---

[1]Real parties in interest Beverly E. McBride, Jerome Blount, and Magdiel Gates confronted charges relating to an armed robbery. On July 9, 1980, Blount moved to suppress evidence seized on December 29, 1979, and on January 8, 1980. Gates joined in the motion as to the December 29, 1979, seizure, and McBride joined in the motion as to the January 8, 1980, seizure. Respondent court denied the motion as to the latter seizure. Only its ruling on the former seizure is before us.

[2]Detective Crapo had a description of Oscar Gates as a 5-foot 7-inch black male weighing 170 pounds, and a 5-year-old picture of him. Crapo observed that the men who left the car and those who later entered it were black males, but he was about 100 to 150 feet away and could not identify any of them.

drawing they had of Oscar Gates, arrested him pursuant to the warrant. The police then searched the car, pursuant to what they claimed and the trial court apparently found to be the consent of its occupants,[3] and that search produced the evidence which the trial court ordered suppressed. "Dale Gates" turned out to be Magdiel Gates, brother of Oscar Gates, and he, along with fellow real parties in interest Beverly E. McBride and Jerome Blount, stand accused of criminal charges to which, presumably, the suppressed evidence relates.

Argument on the suppression motion focused upon the reliability of the information which led Officer Sitterud to call Detective Crapo on December 29, 1979. The source of that information was a person known to Sitterud as James Hill. Hill, who said he was calling from Los Angeles, told Sitterud that he had talked with Oscar Gates a few minutes earlier, that Gates was at a certain telephone number, awaiting a call from James Stevenson (a relative of the murder victim, Lonnie Stevenson), and that he would be there for a short while.

Sitterud, according to his testimony, had been placed in touch with Hill by John Stevenson, brother of the murder victim. Hill, purportedly a friend of the Stevensons, was acting as a liaison between members of the Stevenson family and Oscar Gates, who was engaged in some sort of extortion plot against them. Sitterud had not checked into Hill's background, did not know his phone number or address or how long he had been a "friend" of the Sitterud family—or, indeed, whether his name was really "Hill." He said, however, that Hill had previously supplied him with information to the effect that Oscar Gates had a driver's license issued to him under the name of Clyde Jefferson, and this information proved to be correct. On another occasion, some time after December 13, 1979, Hill gave Sitterud a phone number in Sacramento where Oscar could supposedly be reached, and when Sitterud traced that number he found that it had, indeed, been registered to Oscar Gates or to his alias, Jefferson, though investigation established that Gates had moved from that location in October or November.

At some point, Sitterud said, Hill called him and gave him a second number at which Oscar Gates could supposedly be reached. On December 28, 1979, Sitterud traced that number to a Vallejo address, but took no further steps. It was this number which Hill gave to Sitterud on De-

---

[3]The trial court announced such a finding *after* having granted the motion to suppress. We do not attempt to determine whether this constituted a definitive ruling by the trial court on that issue.

cember 29, 1979, and it was this address which Sitterud gave to Crapo minutes later.

*Discussion.*

■ In *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], the Supreme Court restated the standards for determining the validity of a detention: "It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation." (*Id.*, at p. 892.) The critical question in the latter case is whether "the circumstances known or apparent to the officer . . . include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." (*Id.*, at p. 893.)

Recently, the Supreme Court clarified the appellate function in reviewing a trial court's application of *Tony C.* standards: "the first issue to be decided, i.e., whether the officer subjectively entertained a suspicion that there was criminal activity afoot and the person he intended to stop was involved in it, is a question of fact: the officer either did or did not have that suspicion at the time he acted. Under *Lawler* [*People* v. *Lawler* (1973) 9 Cal.3d 156 (107 Cal.Rptr. 13, 507 P.2d 621)], therefore, review of a trial court's finding on that issue is limited by the substantial evidence test. [Fn. omitted.] But the next step in the inquiry, i.e., whether it was objectively reasonable for the officer to entertain that suspicion, is a question of law: it implicates the constitutional standard of reasonableness—a standard, as *Lawler* recognizes, that the appellate courts have the 'ultimate responsibility' to administer. It follows that the substantial evidence test does not limit review of this issue, and the appellate court must make an independent determination whether the officer's suspicion was constitutionally reasonable in the circumstances of the case." (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597-598 [174 Cal.Rptr. 867, 629 P.2d 96].)

(2a) Application of the two-step inquiry mandated by *Tony C.* is complicated somewhat in this case by the multiple levels of information, inference, and activity which led to the detention. In a typical detention case, a police officer observes conduct which leads him to suspect that a person is committing, has just committed, or is about to commit a crime. Here, the crime which underlay the detention was the murder of Lonnie Stevenson, and the culprit had already been identified in an arrest warrant, not challenged in these proceedings, as Oscar Gates. The question was not whether there was reason to detain Oscar Gates, but whether there was reason to stop the car and detain the occupants because Oscar Gates might be one of them. It appears to be conceded, and the record would in any event compel the conclusion, that the police officers who stopped the car did so because they suspected Oscar Gates was in it. The remaining issue is whether that suspicion was objectively reasonable.

The officers on the scene suspected Oscar Gates was in the car because they were informed through police channels that Oscar Gates was in the house at which the car stopped to release and take in passengers, and that he was to be there only a short time. Real parties did not claim in the trial court that such an inference was objectively unreasonable, and the trial court did not premise its suppression order upon that ground. Moreover, from our review of the record, we are prepared to say that the suspicion which the police officers entertained in that respect was entirely reasonable under the circumstances. Suspicion focused upon a particular vehicle for a particularized and plausible reason. (See *Jackson* v. *Superior Court* (1969) 274 Cal.App.2d 656 [79 Cal.Rptr. 502].) The situation is quite different from that in *People* v. *Glover* (1979) 93 Cal.App.3d 376 [155 Cal.Rptr. 592], in which police officers established roadblocks on three vehicular escape routes from the scene of a crime, with the intention of stopping every vehicle which came along. The court held that an individual's "mere presence in a moving vehicle on the highway some 15 miles from the scene of a hold-up was plainly inadequate to justify detention." (*Id.*, at p. 382.) That is a far cry from stopping a car which takes on passengers at a residence where a person sought for murder is reasonably believed to be present and about to leave.

Inquiry then shifts to the reliability of the information which was transmitted. ■ It has been held that in a case such as this the prosecution "must establish in court, when challenged, evidence showing that the officer who originally furnished the information had probable

cause to believe that the suspect had committed a felony, or, at the very least, that such officer was in possession of facts amounting to circumstances short of probable cause which would have justified him to personally make the detention. [Citations.]" (*Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189, 196 [91 Cal.Rptr. 429]; *People* v. *Waters* (1973) 30 Cal.App.3d 354, 361 [106 Cal.Rptr. 293]; *People* v. *Collin* (1973) 35 Cal.App.3d 416, 420 [110 Cal.Rptr. 869]; see also, *People* v. *Stephenson* (1969) 268 Cal.App.2d 908, 911 [74 Cal.Rptr. 504].) The People do not dispute this proposition here.

The thrust of real parties' argument in the trial court, and the apparent basis of the trial court's ruling, was that the information which Officer Sitterud received from "Hill" did not provide a sufficient basis for suspecting Oscar Gates to be at the Vallejo address, because Hill was not a "citizen informant," and there existed insufficient basis for concluding that he was credible or his information reliable. The prior information that Hill had supplied did not suffice, real parties argued, because it did not relate to *criminal* activity on the part of Oscar Gates.

This argument is premised upon the familiar principles used in determining whether information received from an informant is sufficient to establish probable cause for search or arrest. (*Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410, 413 [21 L.Ed.2d 637]; *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Fein* (1971) 4 Cal.3d 747 [94 Cal.Rptr. 607, 484 P.2d 583].) ■ We are informed of no authority which holds those relatively stringent principles to be applicable in determining the validity of a detention. (Cf. *People* v. *Flores* (1974) 12 Cal.3d 85, 90 [115 Cal.Rptr. 225, 524 P.2d 353]; *People* v. *Gardner* (1979) 90 Cal.App.3d 42, 50 [153 Cal.Rptr. 160].) It has been said that "the 'tip' which triggers investigative action, unlike that which creates grounds for arrest, need not come from a source of proven reliability." (*People* v. *Stephenson, supra*, 268 Cal.App.2d 908, 911 [information on police occurrence sheet]; *Lane* v. *Superior Court* (1969) 271 Cal.App.2d 821, 824 [76 Cal.Rptr. 895] [unidentified informer tip]; see also *Fraher* v. *Superior Court* (1969) 272 Cal.App.2d 155, 159 [77 Cal.Rptr. 366], disapproved on other grounds, *People* v. *Fein, supra*, 4 Cal.3d 747, 755, fn. 3 [94 Cal.Rptr. 607, 484 P.2d 583]; *People* v. *Koehn* (1972) 25 Cal.App.3d 799, 802 [102 Cal.Rptr. 102]; *People* v. *Lopez* (1975) 52 Cal.App.3d 263, 268 [123 Cal.Rptr. 855].)

It does not follow, of course, that the reliability of the informant is irrelevant in determining the validity of a detention based upon his information. Obviously, the objective reliability of the informant's information must be a factor in determining whether the police officer's suspicion is objectively reasonable. A police officer's suspicion that a particular person is engaged or has engaged in criminal conduct could hardly meet that test if it were based upon information so lacking in any indicia of reliability that no reasonable police officer would entertain a similar suspicion because of it.

■ That is not this case, however. Sitterud's contact with Hill came through the family of the murder victim, and Hill had on occasion provided information concerning Gates which proved (in the case of the automobile license) to be reliable and (in the case of the Sacramento telephone number) to be reliable though somewhat stale. Real parties' observation that this information did not relate to criminal conduct as such seems beside the point. What was at issue on December 29, 1979, was not whether Oscar Gates was guilty of a crime—adequate basis for suspecting him of criminal conduct had already been established, we presume, through the affidavit which resulted in a warrant for his arrest—but rather where he could be found; and on that issue, the prior information which Hill supplied did establish a measure of reliability since it tended to indicate that Hill had knowledge, not readily available, concerning Gates' conduct and whereabouts. That Sitterud may not have taken other steps to ascertain information relating to Hill's credibility, and that he did not call for an earlier surveillance of the residence in Vallejo, might be relevant if one were undertaking an overall evaluation of Sitterud's investigatory tactics but hardly establish that it was not reasonable for Sitterud to suspect, on December 29, 1979, that Oscar Gates was, indeed, where Hill said he was.

We conclude that the trial court erred in granting the suppression motion on the ground that the detention which preceded it was invalid. Since it appears that the trial court may not have completed its consideration of alternative grounds for suppression asserted by the various defendants, resumption of the hearing on the motion would be appropriate.[4]

---

[4]Real parties contended the search was not consensual, that it was impermissibly broad, and that the detention was of impermissible duration. It is unclear whether the respondent court had ruled definitively on those issues, which are not before us. On remand, that court will have an opportunity to determine whether or to what extent further consideration of those issues is required.

A peremptory writ will issue directing the respondent court to vacate its order of July 29, 1980, suppressing evidence in the above matter, and to conduct such further proceedings consistent with this opinion as may be appropriate.

Racanelli, P. J., and Newsom, J., concurred.