[No. A030803. First Dist., Div. Three. Mar. 26, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
TYRONE TIMMS, Defendant and Appellant.

COUNSEL

Judd C. Iversen for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WHITE, P. J.**—After appellant and defendant Tyrone Timms' motion to suppress evidence pursuant to Penal Code section 1538.5 was denied, he entered a plea of nolo contendere to the crime of involuntary manslaughter and admitted that he used a firearm during the commission of the offense within the meaning of Penal Code section 12022.5.[1] At the time appellant entered his plea of nolo contendere it was agreed that if this court reversed the ruling on the section 1538.5 motion, the prosecutor would strike the gun use allegation. Appellant contends on appeal that the trial court erred in not suppressing the gun found after a warrantless search of his house.

Daly City Police Officers Margaret Smith and Donald Griggs received a report of a shooting incident at 79 Norwood about 4:35 a.m. on December 26, 1983. According to the dispatcher, the reporting party identified himself as Tyrone Timms; asked for an ambulance because someone had been shot; and claimed that intruders had broken in, assaulted the victim and then fled. Officer Smith received appellant's name and a description of two male, Black suspects before she arrived at the scene.

Upon the officers' arrival at 79 Norwood, Officer Smith knocked on the front door and it was opened by appellant. Appellant invited the officers in, pointed to a dead body and indicated that the victim had been shot. The victim (Donald Donabedian) was lying on his stomach on the floor with a door on top of him. He had a gunshot wound in the back of his head and another "gunshot or a hole in the sweater towards his back, . . ."

Within minutes of their arrival, Officer Smith checked the house for suspects. She noticed that there was blood in the kitchen, including on the telephone; blood and broken glass in the hallway; a broken light near the

---

[1]There is some discrepancy whether appellant actually entered a plea of nolo contendere to voluntary or involuntary manslaughter. However, the abstract of judgment states that appellant was convicted of involuntary manslaughter and imposed the lower term of two years.

bathroom door; and blood on the stairway to the garage. Smith found "a lot of blood" in the bathroom, as well as a broken towel rack and mirror and an apparent gunshot hole in the ceiling.

Appellant appeared to have been in a fight. His right eye was swollen and discolored, he had a cut beneath his eye, a bite mark on his neck and several scratches on his chest, shoulders and back, which were visible through his torn sweater. The more time Officer Smith spent with appellant, the bruises became more apparent on appellant's shoulders, back and neck.

When appellant was asked what had happened, he initially said that he and the victim were sitting on the couch talking when there was a knock on the door. Two Black men came in, "pushed [appellant] aside and went after Mr. Donabedian." At another point appellant claimed that he was on the floor and Donabedian in the bathroom when the assailants burst in and went after the victim. Officer Smith later asked appellant for a better description of the suspects. He said that two White men had broken in, but immediately corrected himself when reminded of his earlier indication that the assailants were Black.

Officer Smith asked appellant if he would accompany her to the police station to give a more complete statement; he agreed and they left for the police station around 6:30 a.m. Although by the time appellant and Officer Smith departed for the police station, Officer Smith considered appellant to be a suspect, he was not under arrest. When they left, other officers, including Griggs, remained at the scene.

Appellant was interviewed by Lt. Thomas Reese at 6:49 a.m. He was first advised of and waived his *Miranda* rights. Appellant stated that two White males had entered the residence, but gave extremely vague descriptions of them. He admitted owning two handguns, one of which was in a safety deposit box. Appellant claimed that the other, a .38 caliber gun, was in the hall linen closet. Reese gave this information to the officers at the scene. He did not, however, request a consent to search.

After the officers at the scene received Reese's telephone call, they searched the linen closet twice, but found no gun. At 1:20 p.m. Officer Griggs and three or four other officers began a more comprehensive search of the residence. Officer Griggs did not know whether any search warrant had been obtained or if appellant had given consent for a comprehensive search of the premises.

In one of the back bedrooms Griggs found a .38 caliber gun in the pocket of a jacket hanging in the closet. In a pair of boots on the floor of the closet in the other bedroom were three live bullets and three ejected cartridges.

Criminalist Nicholas Philip Stumbaugh testified that the gun was unloaded when found. It appeared that three of the chambers had been used since the gun had last been cleaned. The empty cartridges found in the boot had been fired from that gun. A bullet from the victim's brain had the same class characteristics as a test bullet shot from the gun. However, Stambaugh was unable to tell if the bullet found under the victim's body was fired from the gun. The gun was registered to appellant by the Chicago Police Department.

▆▆▆ The magistrate found that appellant impliedly consented to the search of his residence. When the superior court denied appellant's motion to suppress evidence, it made no explicit findings, but the Attorney General states "implicit in the judge's order denying the motion to suppress is a finding that appellant consented." The Attorney General argues that the following facts support the finding that appellant impliedly consented to a complete search of his residence: appellant called the police, reported a shooting and requested assistance. He also gave a description of the assailants. When the police arrived, appellant invited them into the residence, showed them the body, gave further vague descriptions, then agreed to accompany Officer Smith to the police station even though he knew other officers were still at his residence, nor did he indicate by words or actions that he objected to a more intrusive search of the property. Appellant told Officer Reese that he owned and kept in the house a .38 caliber gun.

There is no dispute that appellant was not specifically asked for a consent to search and it was stipulated that the search was conducted without warrant. ▆▆▆ "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298-299, 98 S.Ct. 2408].) ▆▆▆ The prosecution has the burden of establishing that a warrantless search falls within one of the exceptions. (*Id.*, at pp. 390-391 [57 L.Ed.2d at pp. 298-299].) ▆▆▆ Consent to search which is freely and voluntarily given constitutes an exception to the warrant requirement. (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548 [20 L.Ed.2d 797, 802, 88 S.Ct. 1788]; *People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) Consent to search may be implied by conduct, although it may not be implied merely from a person's failure to object to the search. (*People* v. *Harrington* (1970) 2 Cal.3d 991, 995 [88 Cal.Rptr. 161, 471 P.2d 961]; *People* v. *Nelson* (1985) 166 Cal.App.3d 1209, 1215 [212 Cal.Rptr. 799]; *People* v. *Hackett* (1981) 115 Cal.App.3d 592, 598 [171 Cal.Rptr. 320].)

▆▆▆ In *Mincey* v. *Arizona, supra,* 437 U.S. 385, 395 [57 L.Ed.2d 290, 301-302], the United States Supreme Court held that there is no "murder

scene exception" to the warrant requirement. The question for this court then becomes to what extent appellant consented to the search of his home when he invited the officers upon their arrival at the scene and if it can be implied that appellant consented to a further search when he told Officer Reese that there was a gun in his linen closet.

In *Thompson* v. *Louisiana* (1984) 469 U.S. 17 [83 L.Ed.2d 246, 105 S.Ct. 409], several deputies from the Jefferson Parish Sheriff's Department arrived at petitioner's home in response to a report by petitioner's daughter of a homicide. According to the daughter, petitioner had shot her husband, and then ingested a quantity of pills in a suicide attempt, and then changing her mind, called her daughter, informed her of the situation and requested help. The daughter then contacted the police. Upon their arrival, the daughter admitted them into the house and directed them to the rooms containing petitioner and the victim. After the police removed petitioner to the hospital and secured the scene, they conducted a general exploratory search for evidence of a crime. This search lasted approximately two hours. During the search, the officers found a pistol inside a chest of drawers in the same room as the victim's body, a torn up note found in a wastepaper basket in an adjoining bathroom, and another letter (alleged to be a suicide note) found folded up inside an envelope containing a Christmas card on the top of a chest of drawers. The general exploratory search for evidence was conducted after the premises had already been searched for other victims or suspects. (*Id.,* at pp. 19-20 [83 L.Ed.2d at pp. 249-250, 105 S.Ct. at p. 410].)

In *Thompson* the court pointed out that in *Mincey* "we unanimously rejected the contention that one of the exceptions to the warrant clause is a 'murder scene exception.' Although we noted that police may make warrantless entries on premises where 'they reasonably believe that a person within is in need of immediate aid,' *id.,* at 392, 98 S.Ct., at 2413, and that 'they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises,' *ibid.,* we held that 'the "murder scene exception" . . . is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there.'" (*Id.,* at p. 21 [83 L.Ed.2d at p. 251, 105 S.Ct. at p. 411].) The court in *Thompson* concluded that "Petitioner's call for help can hardly be seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary." (*Id.,* at p. 22 [83 L.Ed.2d at pp. 251-252, 105 S.Ct. at p. 412].)

It should be noted that the state in *Thompson* tried to justify the search on the bases of consent and pointed to the daughter's apparent authority

over the premises when she originally permitted the police to enter. Since the Louisiana Supreme Court's decision does not attempt to validate the search as consensual, the United States Supreme Court expressed "no opinion as to whether the search at issue here might be justified as consensual." (*Id.*, at p. 23 [83 L.Ed.2d at p. 252, 105 S.Ct. at p. 412].)

In *People* v. *Superior Court (Arketa)* defendant Gonzales was advised by Officer Rasmussen that officers believed that they had observed someone run into his house and that they would like to enter the house to see if they could find him. Defendant Gonzales replied that there were persons in the house and that the officers could come in if they wished. The officers entered the house and eventually found a three-foot crowbar located in the closet of a bedroom. (*People* v. *Superior Court (Arketa)* (1970) 10 Cal.App.3d 122, 125 [89 Cal.Rptr. 316].) The court in holding the search was unlawful stated: "At best, the consent given by defendant Gonzales to the officers authorized them to enter his premises to look for a man who might answer the description of the person seen running towards the house. It did not extend to a thorough search of the house, including its closets, to uncover a crowbar. There is no showing made by the People that the officers had ever advised Gonzales that such a crowbar might be in his premises or that they desired to look for it. *The authority to search pursuant to a consent must be limited to the scope of the consent.*" (*Id.*, at p. 127, italics added.)

Under *Thompson* and *Mincey* it is clear that once the police were summoned to appellant's premises because of a homicide they could make a prompt warrantless search of the premises to see if there were any other victims or suspects on the premises, but emergency calls do not imply consent to unlimited, warrantless searches. As mentioned above, the fact that appellant did not object to officers remaining on the premises after he was taken to the police station does not mean he consented to the general exploratory search of his residence. (*People* v. *Nelson, supra,* 166 Cal.App.3d 1209, 1215.) Even if we assume that appellant telling Officer Reese that he kept a gun in the linen closet was a consent to search the linen closet, it was not consent to search the remainder of the premises.

We therefore hold that the trial court should have granted appellant's motion to suppress the gun found in the jacket pocket in a closet. Since it was agreed in the trial court that if this court did not agree with the trial court's ruling on the motion to suppress the gun, the conviction would stand but the gun use allegation would be struck, we are not reversing the judgment.

The judgment is modified to strike the gun use allegation and the additional two-year sentence imposed for such allegation.

Scott, J., and Barry-Deal, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 5, 1986. Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.